MEMORANDUM OF DECISION
This is an action for Termination of Parental Rights brought by the Department of Children and Families (DCF). The respondent, Luanne G., is the biological mother of Jonathon. The respondent, Joseph R., is the biological father of Jonathon.
PROCEDURAL BACKGROUND
On February 13, 1998, DCF filed a petition alleging that Jonathon was uncared for in that the child was homeless and his home could not provide the specialized care which the physical, emotional or mental condition of the child required.
On February 13, 1998, the court granted DCF an Order of Temporary Custody with regard to Jonathon.
On August 19, 1998, the court found that Jonathon was uncared for and committed him to the care and custody of DCF.
On August 18, 1999, the court ordered that continuing efforts for reunification were no longer appropriate with regard to both parents.
On September 24, 1999, DCF filed a petition for termination of parental rights of the respondent parents. With regard to Luanne, the petitioner alleged that Jonathon had been found in a prior proceeding to have been uncared for and the mother had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. Conn. Gen. Stat. § 17a-112 (c)(3)(B)(1).
With regard to respondent, Joseph, the petitioner alleged that Jonathon had been found in a prior proceeding to have been uncared for and that the father had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, he could assume a responsible position in the life of the child. Conn. Gen. Stat. § 17a-112 (c)(3)(B)(1). The petitioner also alleged that there was no ongoing parent/child relationship that ordinarily develops as a result of a parent having met on a day-to-day basis, the physical, emotional, moral and educational needs of the child, and to allow further time for the establishment or reestablishment of the parent/child relationship would be detrimental to the best interest of the child. Conn. Gen. Stat. § 17a-112 (c)(3) CT Page 6785 (D). The petitioner also alleged that he has abandoned Jonathon in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. Conn.Gen. Stat. § 17a-112 (c)(3)(A).
On March 31, 2000, Luanne consented to termination of her rights with regard to Jonathon. After canvassing Luanne and determining that termination was in the best interest of the child, the court terminated her parental rights.
FACTUAL FINDINGS
The court makes the following findings by clear and convincing evidence based on the testimony and exhibits presented in this case.
In 1990, Luanne and Joe became involved in a relationship which lasted for eight months. Their relationship was volatile and marred by domestic violence. Joe also had problems with Luanne's family. On at least one occasion he threatened to kill all of them and on another occasion he held a knife to Luanne's little sister's throat. As a result of this behavior, Luanne's mother obtained two restraining orders restricting Joe's contact with the family.
In January of 1991, at the same time that Luanne and Joe were in the process of breaking up, Luanne learned that she was pregnant. Luanne and Joe ended their relationship in the winter of 1991. Luanne's mother, Lucille, testified that during one of the restraining order hearings, Joe asked that the order not be entered because he would miss the birth of his child.
Jonathon was born on August 31, 1991. At the time of Jonathon's birth, Joe was attending Army bootcamp in Georgia. While there, he received a certified letter informing him that Luanne had had a child and that she was claiming that he was the father. Joe did not respond to this letter. While Joe had some doubts as to whether he was the father, he was clearly on notice that he might be as of the summer of 1991.
When Jonathon was born, Luanne initially decided to give him up for adoption. However, Joe's mother, Anna, told Luanne's family that she did not want the child given up for adoption and that she wanted him to stay in the family. At that point, Luanne's mother, Lucille, decided that she would help Luanne take care of the child. Lucille invited Anna to visit with Jonathon while he was still a baby. Anna explained to Lucille that she did not want to see the child until a paternity test confirmed that he was Joe's son. Anna also had an attorney send the mother a letter requesting visitation if a test confirmed that the child was her CT Page 6786 grandchild. When she received no response to this letter, neither she nor her son took any action in court to assert parental rights or took any steps to have a paternity test performed.[2]
On December 15, 1994, Lucille obtained guardianship of Jonathon through the probate court because Luanne was having psychiatric problems and Jonathon was being abused by Luanne's boyfriend James R. He had repeatedly assaulted the child who was only two years old.
In February of 1997, Luanne went back to probate court and obtained temporary custody of the child. Lucille objected to the child being returned to Luanne because Luanne had not received any counseling for her problems and was now involved in an unsafe relationship with Scott S. After the child was returned to his mother, Lucille tried to keep Jonathon safe by taking the child to her house on the week-ends and several times during the week. However, while living with his mother, Jonathon was severely abused by Scott S. including being punched and kicked in the stomach.
In December of 1997, Lucille went back to probate court and was again given guardianship of Jonathon.
When Jonathon was returned to his maternal grandparents, he needed counseling for the abuse and neglect he had suffered at the hands of his mother and her boyfriends. In December of 1997, Jonathon was enrolled in the Apple Valley Partial Hospitalization Program because of his severe aggression and hyperactivity. He was diagnosed with post Traumatic Disorder and Depressive Disorder.
On January 24, 1998, Jonathon was hospitalized at Elmcrest Psychiatric Hospital for his behavioral problems. He was discharged after one week and then immediately rehospitalized because the maternal grandparents did not feel they could keep him safe because of his uncontrollable behavior. He was then hospitalized at Elmcrest from January 30, 1998 until March 24, 1998.
On February 13, 1998, DCF obtained an Order of Temporary Custody for Jonathon because Jonathon was still engaging in rages and the maternal grandparents did not feel they could keep him safe. At the time that the OTC was filed, however, the plan was for the maternal grandparents to care for Jonathon after he received appropriate care and had stabilized.
When Jonathon was discharged from Elmcrest, DCF placed him at the home of his maternal grandparents and he attended the Elmcrest Intensive Outpatient Program. Jonathon was treated by Russell Harrington a therapist with Elmcrest between the fall of 1998 and May of 1999. While CT Page 6787 Mr. Harrington was treating Jonathon, he discussed the concept of a biological father on several occasions. Jonathon had no memories of his father and indicated that he had no interest in meeting him or having him as part of his life.
Between June 1998 and July 1998, Jonathon was admitted to St. Raphael's because of his disruptive behavior. He was then placed at Curtis home between September of 1998 and February of 1999. Because he was repeatedly running away and was constantly bruised, he was returned to his maternal grandparents in February of 1999, where he has resided through the time of trial.
Since March of 1999, Jonathon has attended the Wheeler Clinic program for treatment. Since September of 1999, he has received individual counseling from Dr. Sue Harrington at Wheeler. He has been diagnosed with Major Depressive Disorder, Oppositional Defiant Disorder and Attention Deficit Hyperactivity Disorder. Jonathon has a negative view of himself as different, damaged and inherently defective.
As a result of his treatment at Wheeler Clinic, Jonathon's behavior has improved. He is still, however, a very ill little boy. While it was initially necessary to constantly put him into restraints for his outbursts and tantrums, these behaviors have lessened over time. As recently as March of this year, however, 911 had to be called because Jonathon was out of control and in danger of hurting himself or those around him. Dr. Harrington testified that Jonathon is not yet at the point where he can internally control his emotional outbursts. She also testified, however, that she is hopeful for this child because he does have an ability to form attachments and he is an intelligent child. She has worked closely with Jonathon and his maternal grandparents for the last year. Dr. Harrington has found that Jonathon feels loved, safe and attached to his grandparents. Jonathon's maternal grandfather goes camping and fishing with Jonathon and participates in boy scouts with him. Both maternal grandparents have been highly involved in Jonathon's treatment. Dr. Harrington testified that she believes that Jonathon's maternal grandparents can meet his special needs.
Dr. Harrington has also discussed the concept of a biological father with Jonathon. He views fathers as bad men who hurt people. He was very disturbed by the concept of all children having a biological father even if they have not seen him. Dr. Harrington found that Jonathon has no memories of his biological father.
Joseph R.
Prior to 1995, Joe never made any attempt to see Jonathon. In 1995 or CT Page 6788 1996, Joe did see Jonathon twice at Luanne's invitation. He took the child shopping and gave him several presents including his watch. He told his mother at that time that he was interested in having a paternity test and in taking care of his child. He did not, however, take any action at this point to confirm his paternity.
In December of 1996, Joe was arrested for an incident in which he was intoxicated and ran over another individual. In December of 1997, he was convicted on two counts of Reckless Endangerment and one count of Assault 2. He was sentenced to serve one year in jail.
While incarcerated, Joe was contacted by DCF because Luanne had named him as the putative father in the neglect/uncared for proceedings. As part of these court proceedings, Joe had a paternity test done that confirmed that he was the father of Jonathon. In April of 1998, Joe finally acknowledged paternity of Jonathon who was now six years old.
In May of 1998, Joe submitted to a court ordered psychological evaluation of his current personality functioning to aid in determination of his ability to parent Jonathon. Dr. Phillips found that Joe did not display a capacity for separate understanding of others or for anticipating the extensive and complicated needs of his son.
On August 19, 1998, the court ordered that Jonathon's therapist, Russell Harrington, would have to approve any contact between Jonathon and Joe. Joe did contact Mr. Harrington to see if he could have a visit with Jonathon and the therapist. Mr. Harrington told Joe that he would have to come in and meet with Mr. Harrington individually before he would consider his meeting Jonathon. Joe refused to do this. Joe subsequently told DCF that he considered psychology a "crock" and Mr. Harrington a "sicko". After Joe contacted Mr. Harrington about visitation, Mr. Harrington recommended that visitation not occur because it would not be in the child's best interest.
At around the same time that the TPR papers were filed, Joe started sending support for Jonathon. He also attended a number of different parenting classes.
On April 19, 2000, Joe arranged to have a psychological evaluation performed by Dr. Bruce Freedman. Joe admitted to Dr. Freedman that he might have tried to avoid or awareness that he had a child. Without seeing the child, Dr. Freedman recommended that Joe's parental rights not be terminated.
ADJUDICATION
CT Page 6789
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent unless the court finds in this proceeding that this parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112 (c) (1). The court need not make such a finding, however, if a court has determined at a hearing pursuant to subsection (b) of § 17a-110 that such efforts are not appropriate. On August 18, 1999, the court made the requisite finding that further efforts to reunify the parents with their child were not appropriate.
B. Statutory Grounds
To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112 (c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. Practice Book § 33-3
(a). The relevant date in this case is September 24, 1999.
FAILURE TO REHABILITATE
"A statutory ground for termination arises when the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). This statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child and further, that such rehabilitation must be foreseeable within a reasonable time." In re Luis C., 210 Conn. 157, 167
(1989).
No dispute exists that this court has previously found Jonathon to have been uncared for, thus satisfying a statutory prerequisite. At the time Jonathon was adjudicated uncared for, Joseph was not provided with steps. Specifically, he was never ordered by a court to obtain individual counseling. The court did order that Joseph not be allowed visitation until Jonathon's therapist found that it would be in the child's best interest. As of the relevant adjudicatory date, none of Jonathon's therapists ever found that it would be in Jonathon's best interest for him to visit with his father. However, the record is clear that Joe CT Page 6790 wanted to have visitation with his son, did attend one DCF administrative case review and attended court hearings regarding his son. He has not been involved in any criminal proceedings since his one conviction and has not violated his probation. He has maintained adequate housing and income since being released from prison. There is no evidence of any substance abuse his release from prison. Based on this record, the petitioner has failed to prove by clear and convincing evidence that Joe has failed to rehabilitate within the meaning of the statute.
NO ONGOING PARENT/CHILD RELATIONSHIP
Petitioner also alleges that Joseph and Jonathon have no ongoing parent/child relationship that ordinarily develops as the result of the parent having met on a day-to-day basis, the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent/child relationship would be detrimental to the best interest of the child. Conn. Gen. Stat. §17a-112 (c)(3)(D).
The Connecticut Supreme Court in In re Jessica M., 217 Conn. 459 (1991) found that termination on these grounds is inappropriate unless "the child has no present memories or feelings for the natural parent" or that if such child does have some memories, "no positive emotional aspects of the relationship survive." Id. at 468-70.
Jonathon has no memories of his father. Additionally, because of the abuse that this child has suffered at the hands of Luanne's various boyfriends he views fathers as mean people who hurt other people. "In determining whether there is no ongoing parent-child relationship the court should consider the feelings of the child towards the parent especially if those feelings are positive rather than negative. In reMegan M., 24 Conn. App. 338, 341 (1991). Based on all of the evidence presented, the court finds by clear and convincing evidence that Jonathon has no memories of his father. Accordingly, the court finds that there is no ongoing parent/child relationship within the meaning of the statute.
Because the court has determined that no parent/child relationship exists, it must next consider whether to allow further time to develop such a relationship would be detrimental to the best interest of the child. In this case, further time would be detrimental to Jonathon. Jonathon has made progress in addressing his serious emotional problems. He is still, however, an extremely fragile child who needs consistency and stability in his family environment.
"It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents. There is CT Page 6791 little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current `home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged." Lehman v. Lycoming County Children's Services, supra,458 U.S. 502, 513 (1982). Jonathon needs and deserves permanency and to allow further time to attempt to develop a relationship with his father would not be in his best interest.
Accordingly, the court finds by clear and convincing evidence that there is no ongoing parent/child relationship within the meaning of the statute.
ABANDONMENT Conn. Gen. Stat. § 17a-112 (c)(3)(A) provides that a ground for termination exists when "the child has been abandoned by the parent in the sense that the parent has failed to a reasonable degree of interest, concern or responsibility as to the welfare of the child." "Attempts to achieve contact with the child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re Migdalia,6 Conn. App. 194, 208-209, cert. denied, 199 Conn. 809 (1986). "Conversely, where a parent fails to visit a child, fails to display any level of affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209.
The facts presented during trial establish a clear case of abandonment. Abandonment focuses on the parent's conduct. In re Michael M.,29 Conn. App. 112, 121 (1992). Joseph knew or certainly should have known since Jonathon was born that Jonathon was probably his child. Luanne put him on notice that he was the father and Joe admits that she was not involved with anyone else during the time they were together. He chose to ignore this and avoided having a paternity test to determine if he was the father until 1998. He did not see the child for the first four years of his life, did not send any child support or cards or gifts and did nothing to protect Jonathon from the abuse he was suffering. While Joseph was busy getting on with his life, his child was repeatedly savaged by Luanne's boyfriends. Joe then visited with the child twice in 1995 or 1996. At that time, he told his mother he was interested in having a paternity test to determine if he was the father. Instead, he took no action and again dropped out of the child's life. Prior to having the paternity test done in 1998, Joe alluded to his having a child to a friend who testified during the trial.
"There are five general obligations to parenthood: (1) express love and CT Page 6792 affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to provide social and religious guidance." In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 14
(1981). Joe has never supplied food, clothing, medical care or an adequate domicile for this child. He never protected Jonathon from abuse or neglect or intervened when the child was being repeatedly moved between the maternal grandmother and mother. While he visited with the child twice in 1995 or 1996, there has been no "continuing reasonable degree of concern." In re Migdalia, 6 Conn. App. 194, 210 (1986). By completely ignoring the obligations of parenthood for the first seven years of Jonathon's life, Joe had abandoned this child long before DCF even began the juvenile proceedings in 1998. The court finds by clear and convincing evidence that Joe has abandoned the child within the meaning of the statute.
MANDATORY FINDINGS
With respect to the mandatory factual findings required by Conn. Gen.Stat. § 17a-112 (d), except in the case where termination is based on consent, the court makes the following findings:[3]
1. The timely nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
By court order, DCF could not provide visitation to Joe until Jonathon's therapist recommended it was in the child's best interest to do so. DCF did provide Joe with the therapist's name. Joe decided after talking to the therapist to not engage in individual counseling which would have been the first step in facilitating a reunion. DCF also provided Joe with the name of an appropriate parenting class.
2. Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Joe believes that he should have been provided with visitation and parenting classes. Given Jonathon's emotional problems, it was not in Jonathon's best interest for DCF to attempt to reunite the family through visitation. DCF did provide Joe with the name of an appropriate parenting class. Joe does not claim that he was in need of individual counseling or substance abuse programs. He also does not claim that he needed help with housing or obtaining a job. Given the circumstances of this particular case, DCF did make reasonable efforts to reunite the family. CT Page 6793
3. The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
Joe did abide by the court order to not contact the child unless a therapist found it was in his best interest to do so.
4. The feelings and emotional ties of the children with respect to their parents, any guardian and any person who has exercised physical care, custody or control of the children for at least one year and with whom the children have developed significant emotional ties
Jonathon is emotionally attached to his maternal grandparents with whom he has lived on and off for his whole life. He describes them as the best grandparents on earth. He has no emotional ties with his father.
5. Ages of the children.
Jonathon is eight years old.
6. The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (a) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to the incidental visitations, communications, or contributions and, (b) the maintenance of regular contact or communication with the guardian or other custodian of the child.
In the first seven years of this child's life, Joe only visited with his child twice. Since the termination proceedings began, the father did take some parenting classes and he began making some child support payments.
7. The extent to which a parent has been prevented from maintaining a relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
No one engaged in any unreasonable acts that prevented Joe from maintaining a relationship with his child. He was informed from the beginning of this child's life that the child's mother believed he was the father. He had the financial resources to go into court to assert his rights and to have a paternity test done. He chose not to.
DISPOSITION
CT Page 6794
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
Dr. Sue Harrington testified that termination of Joe's parental rights is in Jonathon's best interest. The court attaches great weight to this opinion. She has been involved in this child's treatment since March of 1999 and has provided individual counseling to him since September of 1999.[4] She understands Jonathon's needs. Through her help, and his maternal grandparents' commitment, Jonathon has started to make progress. She believes that he is in need of the stability and permanence that adoption by his maternal grandparents would afford. She testified that the introduction of his father into his life after all these years would be very disturbing and disruptive to Jonathon. She believes that Jonathon is still emotionally fragile and that he will need a long period of stability before he would not be emotionally overwhelmed by the introduction of his father. She also testified that he will not be ready in the next twelve months to emotionally handle the introduction of his father into his life. Based on all of the foregoing, the court finds by clear and convincing evidence that it is in Jonathon's best interest for a termination of parental rights to enter with respect to Joseph R.
Accordingly, a termination of parental rights of Joseph R. is ordered. It is further ordered that the Commissioner of DCF be appointed statutory parent for this child for the purpose of securing an adoptive home. The Commissioner shall file with this court no later than 60 days following the date of judgment, a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
CHASE T. ROGERS
JUDGE OF THE SUPERIOR COURT